PEOPLE v. HOLCOMB.

CRIMINAL LAW—INTENT—ABORTION—EXONERATION.
    The testimony of intent witnesses in prosecution of defendant
    doctor for manslaughter resulting from criminal abortion that
    he had had them sign papers of exoneration previous to com-
    mitting abortions *held*, properly admitted for jury's consider-
    ation, where jury was called upon to determine defendant's
    intent as he used instruments and administered to deceased
    during 3-hour period while she was on his examination table
    (CL 1948, §§ 750.14, 768.27).

Appeal from Recorder's Court of Detroit; Krause
(Paul E.), J. Submitted April 14, 1960. (Docket
No. 56, Calendar No. 57,960.) Decided June 7, 1960.

Clayton E. Holcomb was convicted of manslaugh-
ter resulting from criminal abortion. Affirmed.

*Paul L. Adams*, Attorney General, *Samuel J.
Torina*, Solicitor General, *Samuel H. Olsen*, Prose-
cuting Attorney, *Samuel Brezner* and *Angelo A.
Pentolino*, Assistant Prosecuting Attorneys, for the
people.

*Ivan E. Barris*, for defendant.

KELLY, J. Defendant on leave granted appeals
his conviction by a jury of the crime of manslaughter,
following an alleged abortion, and the death of a

_____

REFERENCES FOR POINTS IN HEADNOTES
1 Am Jur, Abortion § 35.

young woman to whom we shall refer in this opinion as the deceased.

Sam Sclafani testified that he was a married man but intended to divorce his wife and marry deceased; that when he became aware of deceased's condition he made inquiry to find a doctor who would perform an abortion; that he accompanied deceased to defendant's office Monday evening, November 28, 1955; that he showed the defendant a calling card given to him by one Wilfred Brown and that, after examination, defendant informed them that deceased was pregnant and that she should not eat in the morning of the following Thursday (December 1, 1955) but return on that day with $150 and some sanitary napkins; that on Thursday he went to the bank with deceased and she withdrew from her savings account the money necessary to give the doctor; that he accompanied her to defendant's office; that they sat in defendant's waiting room from 2 p.m. until 6 p.m. while defendant was taking care of other patients; that at about 6 p.m. they entered defendant's office and, after payment of the $150, defendant wrote the following on a prescription blank: "My present condition of incomplete abortion was brought about by myself by taking various drugs and by mechanical means"; that he and deceased signed the above memo prepared by defendant; that he heard deceased scream and left the waiting room, entered the examination room and saw her on a table, defendant seated in front of her with an instrument in his hand and pulling something from her vagina; that he left at defendant's orders, but returned again when he heard deceased scream and she then told him that she was scared and that she hurt; that deceased remained upon the examination table for 3-1/2 hours and was then taken to a bed in an adjoining room where she remained until 12 or 12:30 a.m.; that deceased appeared to be deathly ill and when defendant was

asked if she might remain there overnight, defendant told him to take her to a motel; that after deceased had been in the hospital for about 2 weeks and there was a hospital bill of about $1,500 he was being pressed by the hospital to pay the bill and he went to defendant's office and "asked him if he would call the Oakwood hospital and give the guy some kind of satisfaction, tell him that he (would) pay these bills"; that defendant appeared drunk and ordered him to leave and defendant's son told him to go and to come back and in the meantime he would talk to his father; that he returned and talked to the son but did not go back again because the detective in charge of the case told him not to.

Defendant testified that he was 60 years of age and had been practicing as a medical doctor and surgeon for more than 30 years and had never been arrested or convicted; that he was not in Detroit nor at his office on the Monday Sclafani testified he and deceased first visited him; that deceased and Sclafani came to his office about noon on Thursday and that when he interviewed them about 6:30 p.m. Sclafani informed him that "his wife" was severely bleeding and they wanted temporary treatment to alleviate this condition; that deceased told him she had tampered with herself using different mechanical means and had taken medicine to bring about a miscarriage, the last effort being earlier that day; that he advised them that it was a serious situation and they should go to Receiving hospital or to their family doctor; that deceased said she could not do so without her parents finding out; that in an effort to protect himself he wrote the memorandum above referred to and had both of them sign it; that after he had injected ergotrate the vaginal bleeding subsided considerably; that he swabbed out and packed the vaginal tract with antiseptic cotton balls, using a dressing forceps; that he inserted a speculum but did not use

it in such a way as to thrust it into deceased; that he noticed cuts about the cervix but did not see the lacerations in the right fornix of the vagina; that he concluded deceased had suffered a misabortion brought about by natural causes or by the introduction of mechanical means; that at no time did deceased scream but that Sclafani attempted 3 times to enter the examination room while deceased was on the table and on the last occasion defendant became angry and ordered him out; that at approximately 10:30 p.m. deceased was taken from the examination room to a bed in an adjoining room to rest; that he did not commit an abortion and when they left he told them to call her family physician; that on January 17, 1956, Sclafani demanded $1,500 and threatened to call the police and that he handed him the telephone and told him to call the police and Sclafani declined; that a similar conversation took place on January 19th.

Defendant's housekeeper testified that defendant unsuccessfully endeavored to obtain from deceased the name of her family doctor; that during the 3 hours deceased was upon the examination table defendant left her and made 2 trips to the bathroom and she told defendant, "please, please, help her, and finish"; that defendant told her that deceased had tampered with herself and would not go to her own doctor; that the following morning (Friday) Sclafani tried to contact defendant but was unable to do so because defendant had left for northern Michigan.

A carpenter living near Hubbard lake testified that on Monday, November 28, 1955 (the day Sclafani testified he made the first trip to defendant's office), defendant was at his Hubbard lake cottage and when witness left the cottage at 4:30 p.m. defendant and his son were preparing to leave the cottage for Detroit. Both defendant and his son testified that

they left the cottage around 6 p.m.; that the cottage was 225 miles distant or approximately 5 hours' driving time from Detroit.

The deputy medical examiner for the county of Wayne performed the autopsy, and he testified that the cause of death was "laceration of vagina and uterus with peritonitis; laceration of large and small bowel; and interstitial myocarditis"; that the damage to the sexual organs, bowels, and rectum could have been inflicted by a sharp instrument, such as a scalpel but, also, by a long pencil or knitting needle, although it was not probable that it was caused by either a pencil or knitting needle; that in his opinion the person who caused this damage did not know what he was doing or was rendered in such a condition, perhaps due to imbibing alcoholic beverages, where he did not know what he was doing.

The sole question under appellant's statement of questions involved is:

"Did the lower court err, as a matter of law, when, over the objection of defense counsel, it allowed the prosecution to adduce from rebuttal witnesses Farrell and Setterington evidence of like and similar offenses, and did the lower court err, as a matter of law, when it allowed the prosecution, over the objection of defense counsel, to cross-examine the defendant with respect to like and similar offenses?"

Witness Farrell testified that in the fall of 1953 she went to see defendant for the purpose of having a criminal abortion performed; that defendant agreed to render the service for $400, and told her to return in 2 days, at which time the abortion was performed; that she was "asked to sign a piece of paper concerning responsibility in case anything happened"; that she did not read the paper but she believed it was to clear him in case anything happened to her; that she would not have signed the

paper if she had been there for any purpose other than to have a criminal abortion.

Witness Setterington testified that in the fall of 1956 she went to defendant's office seeking an abortion; that after discussing the matter with her and informing her as to what the abortion would cost, the defendant set a date upon which she should return; that he had her sign a paper "to the effect that he was not responsible if anything happened"; that the abortion was performed by defendant.

After rebuttal witnesses Farrell and Setterington completed their testimony, defendant returned to the stand and denied he had ever rendered professional service of any kind to either of them.

Defendant was asked on cross-examination if, when he had deceased sign the paper, he intended to perform an abortion, and he replied, "I did not." Thereupon the trial prosecutor asked if appellant had ever had any woman sign a similar paper when he did not intend to perform emergency services, and, over objection, defendant answered that he had had other women sign other papers but only if they had had incomplete abortions. When asked if he would require a woman desiring an abortion to sign such a paper, he replied: "I wouldn't be doing an abortion on her."

CL 1948, § 750.14 (Stat Ann § 28.204), provides:

"Any person who shall wilfully administer to any pregnant woman any medicine, drug, substance or thing whatever, or shall employ any instrument or other means whatever, with intent thereby to procure the miscarriage of any such woman, unless the same shall have been necessary to preserve the life of such woman, shall be guilty of a felony, and in case the death of such pregnant woman be thereby produced, the offense shall be deemed manslaughter.

"In any prosecution under this section, it shall not

be necessary for the prosecution to prove' that no such necessity existed." .

Defendant argues that Sclafani "was scarcely a man whose background inspires confidence in his credibility" and that defendant, a doctor of medicine for 30 years, was "a man with an impeccable record"; that *People* v. *Lonsdale,* 122 Mich 388, 392, establishes the principle that: "Where the intent or guilty knowledge is a necessary conclusion from the act done, proof of other offenses of a similar character is inadmissible"; that if the jury were to believe the testimony of Sclafani, their verdict would have had to have been, as a matter of course, that defendant was guilty of the offense charged; that the trial record presented a keenly disputed issue of fact, not as to the intent of the defendant but, rather, as to whether the abortion was committed by defendant, as contended by Sclafani, or whether treatment was rendered, as contended by defendant; that *People* v. *Kelsey,* 303 Mich 715, holds that evidence of similar acts of abortion is highly prejudicial and should not be admitted for the jury's consideration.

*People* v. *Kelsey, supra,* dealt with a conviction and sentence for the crime of manslaughter resulting from an abortion. In reversing, this Court stated:

"The only testimony directly connecting respondent with the alleged offense was that of one Henry Lubking who testified that he drove the deceased from her home in Kalamazoo to defendant's office in Cassopolis for the purpose of having the alleged illegal operation performed. Without detailing his testimony, it suffices to say that it tended to establish that the defendant was guilty of the crime charged. In contradiction to this testimony was that of defendant and 2 witnesses sworn in his behalf, which, if the jury had believed it, would have established an alibi. * * *

"During the trial, the witnesses were excluded from the court room. The defendant testified in his own behalf, and on cross-examination, the prosecutor interrogated him relative to 4 other women by a series of questions which insinuated that he had performed abortions on these parties. In each instance, the reply would be either in the negative or that he did not know any party by that name. The woman would then be called into the court room and the cross-examination continue, with the asking of questions such as the following, all of which were denied by defendant:

" 'Q. Did you not in September of 1939, doctor, perform a criminal abortion upon that young lady?'
\* \* \*

"The prosecutor contends that the aforementioned cross-examination was for the purpose of testing the memory and credibility of the defendant. We think, however, that the interrogation went far beyond the boundaries of permissible cross-examination. Such an examination could have been for no other purpose than to create prejudice in the minds of the jurors."

*People* v. *Lonsdale, supra,* reviewed facts which were conclusive that a criminal abortion was procured. A dying statement was introduced that defendant committed the abortion. No proof was introduced by the defendant. Intent was not in issue.

Both *People* v. *Kelsey* and *People* v. *Lonsdale, supra,* presented different questions than the one before us in this appeal.

The question whether he intended to perform an abortion when he had deceased sign the paper was answered by defendant, without objection, as follows: "I did not." Defendant was properly examined as to whether he had other women sign similar papers, and he replied that he did only if they had had incomplete abortions.

Defendant placed in issue deceased's condition when she came to his office, claiming that deceased, or

some other person, had previously attempted an abortion. There was no dying statement of deceased to refute defendant, and Sclafani's testimony was not conclusive on that point. Sclafani's testimony was not of such a nature as to make the testimony of the 2 witnesses who claimed an abortion had been performed on them by defendant inadmissible under the decision in *People* v. *Lonsdale, supra.*

The jury was called upon to determine defendant's intent as he used instruments and administered to deceased during the extended time she was on defendant's table. Was it defendant's intention to alleviate a condition created by a previous abortion; or, was it his intention to commit an abortion?

The testimony of the witnesses who testified that defendant had them sign papers of exoneration previous to committing abortions was properly admitted for the jury's consideration under the provisions of CL 1948, § 768.27 (Stat Ann 1954 Rev § 28.1050), which reads:

"In any criminal case where the defendant's motive, intent, the absence of, mistake or accident on his part, or the defendant's scheme, plan or system in doing an act, is material, any like acts or other acts of the defendant which may tend to show his motive, intent, the absence of, mistake or accident on his part, or the defendant's scheme, plan or system in doing the act, in question, may be proved, whether they are contemporaneous with or prior or subsequent thereto; notwithstanding that such proof may show or tend to show the commission of another or prior or subsequent crime by the defendant."

Affirmed.

DETHMERS, C. J., and CARR, SMITH, BLACK, EDWARDS, KAVANAGH, and SOURIS, JJ., concurred.